MOTOROLA, INC., Plaintiff,

v.

INTERDIGITAL TECHNOLOGY
CORPORATION, Defendant.

INTERDIGITAL TECHNOLOGY
CORPORATION, Plaintiff,

v.

MOTOROLA, INC., Defendant.

Civil Action Nos. 93–488–
LON, 94–73–LON.

United States District Court,
D. Delaware.

June 17, 1996.

Jeffrey B. Bove of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware, Kathleen Jennings of Oberly & Jennings, Wilmington, Delaware; of counsel: Barry Wm. Levine, Gary M. Hoffman, Jeffrey M. Johnson and Howard N. Feldman of Dickstein, Shapiro & Morin, L.L.P., Washington, D.C., George P. McAndrews of McAndrews, Held & Malloy, Ltd., Chicago, Illinois *, for InterDigital Technology Corporation.

Richard K. Hermann of Stradley, Ronon, Stevens & Young, Wilmington, Delaware; of counsel: Robert G. Krupka, Linda S. Resh and Jay I. Alexander of Kirkland & Ellis, Chicago, Illinois and Washington, D.C., for Motorola, Inc.

*OPINION*

LONGOBARDI, Chief Judge.

## I. NATURE AND STAGE OF THE PROCEEDINGS

InterDigital Technology Corporation ("ITC") is the owner of a group of patents which relate to the field of digital wireless telephony. This group of patents includes the six patents-in-suit, all of which originate from one initial patent application filed on March 20, 1985.[1]

ITC alleges that Motorola directly infringes, contributes to the infringement of, and/or induces the infringement of the patents-in-suit, both literally and/or under the doctrine of equivalents through its manufacture, sale, or use of its digital cellular telephone products. ITC further alleges that such infringement was and is willful. Through its declaratory judgment action Motorola denies ITC's infringement allegations and further alleges that the patents-in suit are invalid. ITC seeks monetary and injunctive relief and both sides seek attorneys' fees.

The patents-in-suit contain more than 250 claims. After numerous hearings, the number of claims to be tried was reduced to 24. In addition, ITC abandoned any claim that Motorola infringed the '024 or '391 patents, and the Court entered a judgment of noninfringement in favor of Motorola with respect to these two patents. [Docket Item ("D.I.") 318].

This case was originally scheduled to be tried to a jury for fourteen days beginning February 6, 1995. At the initial pretrial conference on January 26, 1995, however, the Court determined that the parties were not prepared to go to trial. As has been amply documented, this lack of preparedness was caused in principal part by the inability of counsel[2] to communicate with each other with even a semblance of the professionalism expected of members of the bar. The Court

* George P. McAndrews, Esquire and the McAndrews, Held & Malloy law firm did not file appearances in these cases until after the completion of the trial and after the completion of post-trial briefing.

1. The six patents-in-suit are:
 a. U.S. Patent No. 4,675,863, which issued June 23, 1987 (the " '863 patent");
 b. U.S. Patent No. 4,817,089, which is a continuation of the '863 patent and issued March 28, 1989 (the " '089 patent");
 c. U.S. Patent No. 4,921,705, which is a continuation of the '089 patent and issued March 27, 1990 (the " '705 patent");
 d. U.S. Patent No. 5,121,391, which is a continuation of the '705 patent and issued June 9, 1992 (the " '391 patent");
 e. U.S. Patent No. 5,022,024, which is also a continuation of the '705 patent and issued June 4, 1991 (the " '024 patent"); and
 f. U.S. Patent No. 5,119,375, which is a continuation of the '024 patent and issued June 2, 1992 (the " '375 patent").

2. The Court's comments regarding the conduct of counsel, both here and elsewhere in the Court's Opinion, are not directed to local counsel for either party. They acted at all times in con-

held two more pre-trial hearings in an attempt to keep the trial date, but when insufficient progress was made the trial was rescheduled for fourteen days beginning March 2, 1995. The Court and counsel then embarked upon a month long pretrial process punctuated by nine additional pretrial hearings. The Court took these unprecedented steps to bring this matter to trial because of representations by counsel regarding the importance of the case and their ability to try the case in the allotted time if only the Court could reschedule the trial with minimal delay.

Trial finally began on March 2, 1995. Due to ITC's unwillingness or inability to try their case within the time originally agreed upon, the Court extended the trial from fourteen days to seventeen days. As an additional accommodation to ITC, the Court relaxed its original ruling that the trial time would be split evenly between the parties.

On the eighteenth day, the Court gave its charge and the jury began its deliberations. After four days of deliberations the jury rendered its unanimous verdict that ITC had not proven that Motorola had infringed any of the 24 claims and that each of those claims was invalid.

ITC subsequently filed its motion to alter or amend the judgment, for judgment as a matter of law ("JMOL"), or, in the alternative, for a new trial. [D.I. 303]. Motorola subsequently filed a motion for an award of attorneys' fees.[3] [D.I. 302]. This is the Court's decision on those motions.

## II. TECHNOLOGICAL BACKGROUND

The digital wireless telephony system claimed in the patents-in-suit is comprised of two components, a base station and a subscriber unit. The representative claims fall into three categories: base station claims, subscriber unit claims, and system claims. The Court will describe the operation of this system in very general terms only, because any level of specificity leads straight into disputed issues. The base station is connected to a public telephone system, which the parties refer to as the "Public Switch Telephone Network" ("PSTN"). The base station receives an information signal (i.e., a telephone call) from the PSTN and performs a number of functions on the signal (conversions, compression, etc.) which are required by the patent. The signal is then transmitted to the subscriber units.

One problem encountered by wireless telephony systems is that the Federal Communications Commission ("FCC") has allocated a limited number of radio frequencies for telephone transmission use. As wireless telephones become more popular, this "frequency spectrum" becomes more fully utilized and limits the further growth of the industry. Because it is unlikely that the FCC can or will substantially expand the frequencies available to wireless telephone systems, the industry has sought to develop a number of techniques for making more efficient use of the available frequency spectrum. One such technique which is utilized in the patented system and the accused products is Time Division Multiple Access ("TDMA").

TDMA makes more efficient use of the frequency spectrum by time-slotting multiple signals on each frequency channel. The patents describe a number of functions which are necessary to allow the subscriber units and the base station to communicate with each other in this time-slotted manner. For example, the base station must be able to combine multiple information signals into a single signal to be transmitted, and a given subscriber unit must be able to pick out which portion of the incoming signal is intended for it and which portion is intended for another subscriber unit.

Finally, the patent claims describe subscriber units which receive the information signal from the base station, and perform several functions so that the signal may be delivered to the human ear. The subscriber unit also must take an analog voice signal and process it and transmit it back to the base station utilizing the TDMA technique.

formity with the high standards of the Delaware Bar. In addition, George P. McAndrews and the McAndrews firm did not participate in any trial activity or brief writing.

3. Motorola also filed a motion for costs, [D.I. 301], which the Court dismissed as premature pursuant to D.Del.Local R. 54.1.

To a large extent the functions performed by the subscriber units, and the disputes revolving around them, mirror the functions performed by the base station. Some aspects of the subscriber stations, however, are unique to the subscriber station. One such example is that the subscriber stations receive and transmit at different times, which the parties refer to as "half-duplex" operation.

The parties dispute exactly what is required in many of these steps as they are described in the patent claims and further dispute whether or not these functions are performed by Motorola's accused products.

Four groups of Motorola products are at issue in this suit. United States Digital Cellular ("USDC") products are perhaps the most familiar to the average consumer, because they are the cellular telephones which are so common in America today. ITC's infringement case with respect to USDC products involved presentation of evidence relating to their use in cellular systems with base stations manufactured by Ericsson, a third party. Motorola's Personal Digital Cellular products ("PDC"),[4] which consist of both subscriber units and base stations, are made for use in Japan. Motorola's Groupe Speciale Mobile products ("GSM"), which consists of both subscriber units and base stations, are made for use in Europe. Finally, Motorola's Mobile Integrated Radio System ("MIRS")[5] products, which consist of both subscriber units and base stations, is essentially a radio dispatch system with telephone system interface capability, and is used in fleet operations such as ambulance or taxi companies.

### III. ITC'S RULE 59(e) MOTION TO AMEND THE VERDICT

■ Rule 59(e) allows parties to file a motion "that questions the correctness of the judgment," New Castle County v. Hartford Accident & Indem. Co., 933 F.2d 1162, 1176 (3d Cir.1991). ITC contends that Motorola presented two alternative theories at trial: (1) ITC's patents were not infringed and valid, or (2) ITC's patents were infringed but invalid. ITC further contends that Motorola presented two distinct alternative claim interpretations in support of these two theories: a "narrow" interpretation which supported Motorola's noninfringed/valid theory, and a "broad" interpretation which supported Motorola's infringed/invalid theory. ITC now contends that the jury's verdict of noninfringement and invalidity could only have been reached by the jury if they impermissibly used Motorola's "narrow" interpretation in considering infringement and used Motorola's "broad" interpretation in considering validity. ITC requests that the Court overturn the jury's invalidity verdict. Motorola denies that it pursued two alternative theories at trial, and contends that the record supports a finding that the jury used a single claim interpretation for both noninfringement and invalidity.

■ There can be no doubt that a jury must use the same claim interpretation for determining issues of noninfringement and invalidity. SmithKline Diagnostics, Inc. v. Helena Lab Corp., 859 F.2d 878, 882 (Fed. Cir.1988). The Court specifically instructed the jury regarding this requirement:

**4.2 Claims Construed the Same way for Validity as for Infringement:**

The first step in determining if Motorola has proved any of the asserted claims of ITC's patents are invalid is to interpret each claim of each patent.

You must interpret the claims the same for determining validity as you did for infringement. That is, if you interpreted a claim broadly or narrowly in making your decision as to whether Motorola infringed, then you must interpret that claim equally broadly or narrowly for the purpose of deciding whether the claim is valid; that is, whether the prior art shows that the claim is not new or would have been obvious. I have previously instructed you on how to interpret claims. Those instructions apply here as well.

ITC provides ample citation to portions of the trial transcript which demonstrate that an important theme in Motorola's case was that ITC's patents were invalid if they were

---

**4.** The parties also refer to PDC products as "Japanese Digital Cellular" or "JDC."

**5.** MIRS products are also referred to as "Enhanced Special Mobile Radio" or "ESMR."

read as broadly as would be necessary for them to cover Motorola's products. The Court finds no support in the record, however, to overturn the entire jury verdict on the grounds that this was Motorola's only contention. By emphasizing one position Motorola did not waive its right to obtain a verdict of noninfringement and invalidity so long as that allegedly inconsistent verdict may be fairly reconciled with the evidence in the record. Indeed, ITC raised the spectre of a "double-standard" in their cross-examination, and Motorola's experts made clear in their testimony that they were aware of this danger. [*See* discussion of Dr. Goodman's testimony regarding compression means *infra*]. The Court's instructions to the jury made them aware of this danger as well, and the verdict does not mandate a finding that the jury ignored their duty to follow the law. The Court rejects ITC's argument paraphrasing or characterizing Motorola's argument to the jury.

The Federal Circuit looks to the law of the forum, in this case the Third Circuit, in analyzing the issue of inconsistent jury findings. *Arachnid, Inc. v. Medalist Marketing Corp.*, 972 F.2d 1300 (Fed.Cir. 1992). This Court has "very limited discretion" in determining whether or not a jury's verdict is inconsistent. *Loughman v. Consol–Pennsylvania Coal Co.*, 6 F.3d 88, 105 (3d Cir.1993). "In reviewing the propriety of a jury verdict, [the Court's] obligation is to uphold the jury's award if there exists a reasonable basis to do so." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989). "A verdict must be molded consistently with the jury's answers to special interrogatories when there is any view of the case which reconciles the various answers." *Bradford–White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1159 (3d Cir.), *cert. denied* 493 U.S. 993, 110 S.Ct. 542, 107 L.Ed.2d 539 (1989). While the Court's mandate to search the record for any evidence which the jury "could have" believed in reaching its verdict may seem to weigh unfairly in favor of the verdict-winner, it is a crucial aspect of the constitutional right to a trial by jury which was demanded by ITC in this litigation. The Court has reviewed the nature and sufficiency of the evidence *infra* in evaluating ITC's

motion for judgment as a matter of law, and while the Court's analysis is presented in more detail in that portion of the opinion, the Court finds that the jury's noninfringement and invalidity verdicts are not necessarily inconsistent and therefore may not be overturned by the Court on that ground. ITC's motion to alter or amend the judgment is denied.

## IV. RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Legal Standard

In resolving a motion for a JMOL in a case that has been tried to a jury, the Court:

> must determine whether there exists evidence of record upon which a jury might properly have returned a verdict in [the non-movant's] favor *when the correct legal standard is applied.* If there is not, [the movant] was entitled to have the question removed from the jury and decided as a matter of law.

*Markman v. Westview Instruments*, 52 F.3d 967, 975 (Fed.Cir.1995) (en banc), *aff'd* — U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (emphasis in original) (quoting *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 756 F.2d 1556, 1560 (Fed.Cir.1985)). "Notwithstanding the jury's verdict, on review of a motion for JMOL the court retains the power and duty to say what the correct law is, and then to examine the factual issues submitted to the jury and determine whether findings thereon are supported by substantial evidence and support the verdict under the law." *Id.* (citations omitted). The Federal Circuit has defined "substantial" evidence:

> "Substantial" evidence . . . is such relevant evidence, taken from the record as a whole, "as might be accepted by a reasonable mind as adequate to support the finding under review." In reviewing the evidence "a court must (1) consider all the evidence, (2) in a light most favorable to the non-mover; (3) drawing reasonable inferences favorable to the non-mover; (4) without determining credibility of witnesses, and (5) without substituting its

choice for that of the jury between conflicting elements in the evidence."

*Dana Corp. v. IPC Ltd. Partnership,* 860 F.2d 415, 417 (Fed.Cir.1988), *cert. denied* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989) (citations omitted).

ITC contends that the Federal Circuit's *Markman* decision, which issued only days after the jury returned its verdict, requires the Court to construe *all* claims as a matter of law. ITC further contends that once this is done, the record supports granting ITC's motion for JMOL of infringement and validity on all claims. In response, Motorola contends that the claims in dispute in this case utilize section 35 U.S.C. § 112 ¶ 6, means or step plus function language, and that *Markman* does not require that construction of such claims is a matter of law.

■ Motorola also contends as a threshold matter that ITC is barred from bringing a motion for a JMOL because ITC failed to raise any specific grounds in support of its JMOL during trial. *See Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1173 (3d Cir.1993) (a Rule 50(b) motion must be preceded by a Rule 50(a) motion that is *"sufficiently specific* to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient.") (emphasis in original); *Bonjorno v. Kaiser Aluminum & Chemical Corp.,* 752 F.2d 802, 814 (3d Cir.1984), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986) (the requirement that the specific grounds for a JNOV must be asserted in the motion for a directed verdict, before the issue is submitted to the jury, "affords the non-moving party an opportunity to reopen its case and present additional evidence.").

ITC's motion for JMOL consisted of the following:

Mr. Hoffman: Your Honor, for the record, we do move for judgment as a matter of law in connection with the declaratory judgment claims filed by Motorola.

The Court: I'll take it under advisement.

[Tr. 4214, *see also* 4442]. In response, ITC contends that Rule 50 is essentially a notice provision, and that the sufficiency of a motion

for a JMOL must be judged within the context of a given trial. The Court is unpersuaded by ITC's attempt to shift its responsibility to the Court and the opposing party. [D.I. 331 at 11]. Responsibility for making a sufficiently specific JMOL motion remains with the movant at all times. Nevertheless, counsel also has a responsibility to follow the orders and rulings of the Court. The Court made clear that it did not require or desire additional argument at the time the motion was made, and it would be unfair to penalize ITC for acceding to the Court's wishes. The Court will rule on ITC's JMOL motion.

### B. *Discussion—Infringement*

■ Title 35 U.S.C. § 271(a) provides in part:

[W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271 (1984 & Supp.1995). According to the Federal Circuit, the "issue of infringement raises at least two questions: (1) what is patented, and (2) has what is patented been made, used or sold by another." *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983); *see also Rawlplug Co. v. Illinois Tool Works, Inc.,* 11 F.3d 1036, 1041 (Fed.Cir.1993); *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1578 (Fed.Cir.1988); *American Standard Inc. v. Pfizer Inc.,* 722 F.Supp. 86, 92 (D.Del. 1989). Thus, the resolution of the issue of infringement is a two-step process. First, a court must determine the scope of the claims of the patent. *Mobil Oil Corp. v. Amoco Chemicals Corp.,* 779 F.Supp. 1429, 1442 (D.Del.1991), *aff'd,* 980 F.2d 742 (Fed.Cir. 1992). Then, once the scope of the claims is ascertained, the court must determine whether the defendant's allegedly infringing activity falls within the scope of the claims. *Id.*

At trial, the Court followed its customary practice of allowing claim construction issues to be resolved by the jury on the grounds that claim construction often involves underlying factual disputes which are the province of the jury. This practice was agreed to by both parties, who informed the Court early on in this litigation that they did not wish to

file summary judgment motions prior to trial. Accordingly, the Court did not construe the claims for the jury and the jury was instructed on claim construction issues.[6] The parties did not object to this procedure and at no time requested that the Court construe the claims as a matter of law.

Six days after the jury rendered its verdict, the Federal Circuit sitting *en banc* issued its landmark decision in *Markman v. Westview Instruments*, 52 F.3d 967 (Fed.Cir. 1995) (en banc), *aff'd* — U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The Federal Circuit held that "interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court," *Id.* at 970–71, and further held that "in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Id.* at 979.

■■■ ITC contends that if the *Markman* decision had issued before this case went to trial, the Court "would have had to instruct the jury as to the meaning of the claims, including all disputed terms." [D.I. 310 at 11]. The Court disagrees. While the preferable and more efficient course following *Markman* may be to construe the claims for the jury, "it is permissible under *Markman* to construe the claims [for the first time] on a post-verdict motion for JMOL." *Fonar Corp. v. General Elec. Corp.*, 902 F.Supp. 330, 337 n. 3 (E.D.N.Y.1995). Moreover, by invoking its right to a jury trial while simultaneously failing to request that the Court construe the claims for the jury, [1/26/95 Conference, Transcript ("Tr.") 205–06], ITC

waived its right to have the claims construed by the Court.[7]

Regardless of the landmark status of the *Markman* decision, however, the Court must first determine whether the *Markman* decision is even applicable to the claims at issue in the case *sub judice*. The limitations of the 24 claims tried to the jury in this case are stated as a "means" or "steps" for performing a specified "function" but the claims language does not delineate the type of means which actually performs that function. This type of limitation is commonly known as a means (or step)-plus-function limitation, and its use is specifically authorized by 35 U.S.C. § 112, ¶ 6. The Federal Circuit has provided the following explanation of means-plus function elements:

> By its express terms, § 112 ¶ 6 permits an element in a claim to be expressed as a means or step for performing a specified function. However, the scope of such a claim is not limitless, but is confined to structures expressly disclosed in the specification and corresponding equivalents. Thus, the statutory provision prevents an overly broad claim construction by requiring reference to the specification, and at the same time precludes an overly narrow construction that would restrict coverage solely to those means *expressly* disclosed in the specification.

*Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569 (Fed.Cir.1991) (emphasis in original) (citations omitted).

■■■ In *Markman,* the Federal Circuit left for another day the "issue of whether a determination of equivalents under § 112, para. 6 is a question of law or fact." *Markman,* 52 F.3d at 977.[8] ITC makes two pro-

---

6. See Jury Instructions 3.2.1–4.

7. On May 15, 1996, Motorola submitted a letter in which it cited an unpublished Federal Circuit decision for the proposition that ITC waived its right to have the Court construe the claims for the jury. *W.S. Molnar Co. v. IKG Industries,* 1996 WL 128262 (Fed.Cir.1996) (unpublished decision). Federal Circuit Local Rule 47.6(b) provides that this decision is "not citable as precedent and shall not be employed or cited as precedent." The Court emphasizes for the record that it had reached its conclusions regarding waiver prior to this improper submission by Mo-

torola and the *Molnar* decision played no role in the Court's Memorandum Opinion.

8. The Court is aware that the Supreme Court has left open the question of whether a characterization of an issue as "legal" or "factual" is dispositive of right to have that issue decided by a jury. *Markman,* —— U.S. at —— n. 10, 116 S.Ct. at 1393 n. 10. Nevertheless, the Court utilizes the law/fact terminology for ease of reference and emphasizes that the Court's analysis on this issue is based upon Federal Circuit precedent which binds this Court and not a rote application of a law/fact distinction.

posals in addressing how this Court should resolve this open issue in the case *sub judice.* First, ITC contends that construction of means-plus-function language, like any claim language, is a question of law for the Court. The Court believes this is an accurate statement of law, especially given the Federal Circuit's emphasis in *Markman* upon the role of the Patent and Trademark Office in removing ambiguity from patent claims. *Id.* At 986 ("If the patent's claims are sufficiently unambiguous for the PTO, there should exist no factual ambiguity when those same claims are later construed by a court of law in an infringement action.") The Court's conclusion is only strengthened by the Supreme Court's recent unanimous affirmance of the *Markman* decision. —— U.S. ——, 116 S.Ct. 1384.

Thus, the function performed by the means-plus-function element is a claim construction issue which should be resolved as matter of law, because it requires the Court to look only at the patent itself, which has been cleansed of ambiguity by the PTO. Likewise to the extent a dispute exists regarding the meaning of one of the specific means disclosed in the specification, that too is a matter of law which should be resolved by the Court. For instance, if a patent contains a means-plus-function limitation claiming a "means for fastening" and the specification discloses a "button" as a possible fastening means, under *Markman* a court must resolve any disputes regarding both the 1) function of the fastening means, and 2) the meaning of the word "button," as a matter of law.

▋ Determination of function and understanding the nature of the specific means disclosed is only the first part of a means plus function analysis. The second step, as ITC recognizes, involves a determination of whether the accused device "(1) perform[s] the identical function recited in the means limitation and (2) perform[s] that function using the structure disclosed in the specification or an equivalent structure." *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,*

15 F.3d 1573, 1578 (Fed.Cir.1993). ITC contends that the "sweep" of the *Markman* decision warrants viewing these questions as also involving questions of law. [D.I. 332 at 1 n. 2]. The Court finds these questions were for the jury to decide. This conclusion is supported by prior Federal Circuit case law which is not inconsistent with the Federal Circuit's *Markman* decision and thus survives *Markman*, and by the reasoning underpinning the Federal Circuit and Supreme Court *Markman* decisions.

Federal Circuit case law prior to *Markman* clearly indicates that a determination of structural equivalence under § 112 ¶ 6 involves questions of fact. *Symbol Technologies, Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1575 (Fed.Cir.1991) ("the scope of literally infringing 'equivalents' under § 112 ¶ 6 is a factual determination."); *In re Bond,* 910 F.2d 831, 833 (Fed.Cir.1990) (per curiam) ("structural equivalency under section 112 ¶ 6 is a question of fact"). Because the Federal Circuit did not rule on the factual or legal nature of a § 112 ¶ 6 equivalents determination, the *Opticon* and *Bond* decisions are not inconsistent with *Markman* and remain good law which this Court is bound to follow. Moreover, the Court's conclusion that any potential conflict between these decisions and *Markman* is illusory is bolstered by the fact that three of the members of the Federal Circuit *Markman* majority were also members of unanimous panels in either *Opticon* or *Bond.*[9]

In addition, the proficiency of patent examiners in eliminating ambiguity is simply inapplicable to the question of whether an accused product which was probably never even seen by the PTO performs the identical function as the means element through use of substantially equivalent means. For example, a hypothetical patent may clearly and unambiguously describe the function of a "means for fastening" and clearly define what a "button" is, but this does not eliminate the factual nature of subsequent inquiries regarding whether a "zipper" in an accused device performs an identical function

---

**9.** Chief Judge Archer wrote the majority opinion in *Markman* and was a member of the unanimous panel in *In re Bond.* Circuit Judges Nies and Clevenger were members of the *Markman* majority and were members of the unanimous panel in *Opticon.*

and whether this "zipper" is structurally equivalent to a "button."

Moreover, understanding means-plus-function analysis to contain factual inquiries is not inconsistent with the *Markman* conception of patent claim construction as analogous to statutory interpretation:

> Statutory interpretation is a matter of law strictly for the court. There can be only one correct interpretation of a statute that applies to all persons. Statutes are written instruments that all persons are presumed to be aware of and are bound to follow. Statutes, like patents, are enforceable against the public, unlike private agreements between contracting parties. When interpreting statutes, a court looks to the language of the statute and construes it according to the traditional tools of statutory construction, including certain well known canons of construction. A court may also find it necessary to review the legislative history of the statute, which is itself a matter of public record, just as the specification and prosecution history of a patent are public records. While a court may seek from the public record to ascertain the collective intent of Congress when it interprets a statute, the subjective intent of any particular person involved in the legislative process is not determinative. Thus the members of Congress, or staff persons who draft legislation, are not deposed or called on to testify in actions involving statutory interpretation. Similarly, the subjective meaning that a patentee may ascribe to claim language is also not determinative. Thus, it is from the public record that a court should seek in a patent infringement case to find the meaning of claim language.

*Markman* 52 F.3d at 987. The statutory construction analogy, like the PTO proficiency argument, focuses on the Court's duty to resolve disputes regarding terms used in the patent as a matter of law. This analogy should not extend, however, to inquiries regarding issues that are not part of the four corners of the patent, specification, or prose-cution history, such as a § 112 ¶ 6 structural equivalents determination. This distinction in essence draws "a line between issues of document interpretation and product identification", a line which "the Court has drawn repeatedly in explaining the respective roles of the jury and judge in patent cases." *Markman*, —— U.S. at ——, 116 S.Ct. at 1394.

Finally, common sense dictates that a determination of structural equivalents must be left to the jury, because if it were not, there would be nothing left for the jury to decide. Claim 1 of the '705 patent, for example, is expressed entirely in means-plus-function elements. If the Court were to decide the function performed by each of the means-plus-function elements, define the specific means found in the specification, *and* determine whether the accused products contained features which were structurally equivalent to each of the means-plus-function elements, the jury would be reduced to no more than a rubber stamp. Indeed, the jury's role, or lack of role, with respect to means-plus-function claims would differ from its role with respect to all other claims, where they would still decide the question of whether the accused products contain the properly construed limitations of a non-means-plus-function claim. The Court is aware of nothing in § 112 ¶ 6 which would support creating such a dichotomy.

The Court concludes, therefore, that analysis of a means-plus-function limitation is not entirely a legal inquiry, as ITC contends, nor is it entirely a factual inquiry, as Motorola contends. Construction of terms found in the claims or the specification is a legal inquiry, but evaluation of the function and structural equivalence of an allegedly infringing product is a factual inquiry. With this understanding of § 112 ¶ 6 analysis in mind, the Court turns to its review of the jury's noninfringement verdict.

▆▆▆ All nine of the independent claims in this case contain a "compression means" or "compressing" step limitation.[10]

---

10. A given plural number of separate **compression means** for simultaneously compressing the digital signal samples respectively derived from separate ones of the conversion means to provide said given number of separate compressed signals;

The compression limitation involves two issues of claim construction. First, the Court must determine, as a matter of law, the function of the compression means. To determine the "true meaning" of a disputed claim, a Court must examine: 1) the claim at issue; 2) the specification, and 3) the prosecution history. *Markman*, 52 F.3d at 979; *ZMI Corp.*, 844 F.2d at 1579; *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed.Cir. 1985); *American Standard*, 722 F.Supp. at 92. Neither ITC nor Motorola makes any citation to the prosecution history in their post-trial briefing and for this reason the Court presumes that the relevant sources for claim construction in the case *sub judice* are the claims and the specification. The Court finds that the function of the compression means is to reduce the voice information rate in order to reduce the amount of information transmitted over the airwaves. ['863 patent specification, Col 8:8–11; Col 3:34–36]. The Court does not accept ITC's contention that the function should be expanded to include "compression to less than 16 Kbps." The specific number is the result reached by the disclosed means and not the function. While the number may play a role in an evaluation of the structural equivalence of various compression means, the weight attributed to this factor is for the jury to decide.

This function of the compression means, however, was not a matter in dispute at trial. Motorola did not dispute this definition of compression means, [*see, e.g.,* Tr. 1992, 3723], but rather, disputed whether the compression means utilized in the accused products were structurally equivalent to the specific compression means disclosed in the specification.

Before turning to the factual question of structural equivalents, however, the Court must first address a second issue of claim construction raised by ITC. ITC contends that Motorola's expert testimony at trial was predicated on an opinion that the claims contained a limitation requiring that compression means result in the selective deletion of certain information from the digital information signal. The selective deletion limitation is only specifically set forth in claims 162 and 213 of the '375 patent (and their dependent claims). ITC contends that under the doctrine of claim differentiation it is improper to read this limitation into claims 1 and 10 of the '863 patent, claim 1 of the '089 patent, claim 1 of the '705 patent, and claims 91, 133, 219 of the '375 patent (and their dependent claims), which do not specifically contain this selective deletion language.

■ The doctrine of claim differentiation is a canon of claim construction which holds

'863 patent, claim 1; '863 patent, claim 10.
signal **compression means** connected to said conversion means for simultaneously compressing separate digital signal samples derived from said conversion means to provide separate compressed signals;

'089 patent, claim 1; '705 patent, claim 1.
A method . . . comprising the steps of . . . **compressing** the signal samples representative of each of the plurality of first information signals being processed according to pathing assigned at substep *(B)(1)* such *that the signal samples* may *be reconstructed at the predetermined send/receive units to substantially provide the same information as the respective first information signals provided before being processed according to step (B), with the compression step resulting in the selective deletion of at least one signal characteristic of the signal samples,*
 . . . .
*compressing* the signal samples representative of the second information signal such that the signal samples may be reconstructed to substantially provide the same information as the second information signal provided before being processed according to step (E), with the

compression step resulting in a selective deletion of at least one signal characteristic of the signal samples,

'375 patent, claim 162; '375 patent, claim 213 (second paragraph only) (text of claim refers to step "(B)" instead of step "(E)");
A method . . . comprising the steps of . . . **compressing** the signal samples representative of each of the plurality of *first* information signals being processed according to pathing assigned at substep (B)(1) such that such signal samples may be *reconstructed* at *the* predetermined receive units to substantially provide the same information as the respective *first* information signals provided before being processed at step (B),

'375 patent, claim 133 (bold and italic emphasis added); '375 patent, claim 91 (bold emphasis added, italic text not present in claim 91);
A method . . . comprising the steps of . . . **Compressing the signal samples** representative of the second information such that the signal samples may be reconstructed to substantially provide the same information as the second information signal provided before being processed according to step (B),

'375 patent, claim 219.

that when a patent contains both broad and narrow claims, the additional limitation of the narrow claim should not be read into the broad claim. *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 987 (Fed.Cir.1988); *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1570 (Fed.Cir.1983). "The doctrine embodies the common sense notion that ordinarily language of one claim should not be so interpreted as to make another claim, such as a claim dependent on the first claim, identical in scope." 4 Donald S. Chisum, *Patents* § 18.03[6] at 18–70 (1994).

■ The specification discloses two specific compression means, Residual Excited Linear Prediction ("RELP") and Subband Coding ("SBC"). ['863 patent specification at 8:11–14]. ITC does not dispute that these disclosed compression means employ selective deletion techniques. [Tr. 2043]. ITC also does not dispute that RELP and SBC are the only compression means disclosed in the specification. The scope of a § 112 ¶ 6 element must be determined by reference to the specific disclosures made in the specifications. The interpretation of the claimed compression structure as including selective deletion of voice information comes to the claims via § 112 ¶ 6, not from other claims, and thus the prohibition against reading limitations from one claim into another is not violated. *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1538 (Fed.Cir.1991). For this reason, assuming *arguendo* that Motorola's expert testimony was predicated on the existence of the selective deletion limitation in all claims, the Court concludes that this predicate was correct as a matter of law.

By so holding, the Court is *not* holding that the claimed compression means do not, *as a matter of law,* cover products containing compression means that do not employ selective deletion. The selective deletion issue is one factor to be considered and weighed by the jury in evaluating structural equivalence under § 112 ¶ 6.

■ Motorola's USDC, MIRS, and JDC products utilize a Vector Sum Excited Linear Predictive coder ("VSELP"), and Motorola's GSM products utilize a Residual Post Excited Linear Protective coder ("RPE/LTP"), to perform the compression function. Goodman and Cox, Motorola's experts, testified that VSELP and RPE/LTP were not equivalent to RELP or SBC. [Tr. 3723–3737; 2921–24]. This testimony constitutes substantial evidence upon which the jury was entitled to rely in finding that there was no structural equivalence between the compression means in the patents-in-suit and the compression means in the accused products.

Substantial evidence exists to support a finding that neither the claimed compression means nor a structural equivalent is found in the accused products. Each of the 24 claims in suit contains a compression means limitation or depends from a claim with such a limitation. Therefore, on this ground alone, the Court finds that substantial evidence exists to support the jury's verdict of noninfringement on each and every of the 24 claims in suit. The Court thus finds it unnecessary to reach Motorola's additional arguments in support of the noninfringement verdict.[11]

Even if the Court had been required to construe the claims under § 112 ¶ 6 and determine structural equivalence as a matter of law the Court's decision would have mirrored the verdict of the jury.

### C. *Invalidity*

■ A patent is presumed valid. 35 U.S.C. § 282. The party asserting invalidity has the burden of proof. *Id.* This burden is satisfied only by proving facts establishing invalidity by clear and convincing evidence. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 872 (Fed.Cir.1985); *Mobil Oil Corp. v. Amoco Chemicals Corp.,* 779 F.Supp. 1429, 1488 (D.Del.1991), *aff'd* 980 F.2d 742 (Fed.Cir. 1992). The "'clear and convincing' standard of proof of facts is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.'" *Buildex Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988).

---

**11.** *See infra* for the court's discussion of the alleged inconsistency between the jury's invalidity and infringement verdicts.

### 1. *Anticipation*

Title 35 U.S.C. § 102 provides in relevant part:

a person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, ...

 Invalidity by reason of anticipation "requires that all of the elements and limitations of the claim are found within a single prior art reference." *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991); *see Verdegaal Bros., Inc. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed.Cir.), *cert. denied*, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); *Phillips Petroleum Co. v. United States Steel Corp.*, 673 F.Supp. 1278, 1287 (D.Del.1987), *aff'd* 865 F.2d 1247 (Fed.Cir. 1989). "That which would literally infringe if later in time anticipates if earlier than the date of the invention." *Lewmar Marine Inc. v. Barient, Inc.*, 827 F.2d 744 (Fed.Cir.1987) (emphasis omitted), *cert. denied* 484 U.S. 1007, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988). For an invention to be anticipated, there must not be any differences "between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps*, 927 F.2d at 1576. If more than one reference is needed to establish invalidity, then anticipation under § 102 cannot be found. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1267 (Fed.Cir.1991).

 "Furthermore, with an element expressed in terms of a means plus function, 'absent structure [in a prior art reference] which is capable of performing the functional limitation of the 'means,' [the prior art reference] does not meet the claim.'" *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1444 (Fed.Cir.1984) (quoting *In re Mott*, 557 F.2d 266, 269 (CCPA 1977)). The element disclosed in the prior art must be identical to or the structural equivalent of the element disclosed in the patent. *Stoller v. Ford Motor Co.*, 711 F.Supp. 1451, 1456 (N.D.Ill.1989), *rev'd on other grounds* 925 F.2d 1480 (Fed.Cir.1991). "The disclosure need not be express, but may anticipate by inherency where it would be appreciated by one of ordinary skill in the art." *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir.), *cert. denied* —— U.S. ——, 116 S.Ct. 516, 133 L.Ed.2d 424 (1995) (quoting *Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed.Cir.1991)). Anticipation is a question of fact. *Scripps*, 927 F.2d at 1576. Claims cannot be construed differently for invalidity issues than they were for infringement issues. *Beachcombers v. WildeWood Creative Prods., Inc.* 31 F.3d 1154, 1163 (Fed.Cir.1994).

#### a. *1981 Kinoshita Japanese Reference [12] and 1983 NEC RSS Reference [13]*

The jury found that both the 1981 Kinoshita Japanese reference and the 1983 NEC RSS reference anticipated claims 1 through 6 and 10 of the '863 patent, claim 1 of the '705 patent and claims 91, 133, 162 and 178 of the '375 patent. Because ITC's challenges to these two references are virtually identical, the Court will address them together. The Court is mindful, however, that each reference must stand alone in order to support a finding of anticipation and discusses them together only for ease of presentation.

 Before reaching the issues common to these two references, however, the Court must first address ITC's contention that Motorola's expert, Dr. Goodman, did not actually rely upon the 1983 NEC RSS publication, but relied instead on a later 1985 NEC publication. This dispute is material because the jury listed the 1983 NEC RSS publication as anticipating certain claims, but because Motorola did not list the 1985 article on the verdict form the jury made no findings with respect to the 1985 NEC article. In support

---

**12.** *A Digital Mobile Telephone System Using TD–FDMA Scheme*, Kinoshita et al., Denshi Tsushin Gakkai Ronbun Shi, Vol. J64–B, No. 9, pp. 1016–23 (1981). [MTX 51 (original Japanese text); MTX 52A (English translation)].

**13.** *Digital Remote Area Subscriber Radio Telephone System (Digital RSS System)*, NEC Corporation (1983). [MTX 98].

of its contention ITC relies upon Dr. Goodman's testimony that the 1985 NEC RSS document "talked to me a little more as a technical person." [Tr. 3711–12]. Dr. Goodman also testified, however, that he could reach the same conclusions from both the 1983 and 1985 articles, [Tr. 3712], and specifically testified on cross examination that his testimony was based upon the 1983 article. [Tr. 3752, 3840]. The Court rejects ITC's characterization of his testimony.

ITC contends that Motorola did not present sufficient evidence to prove by clear and convincing evidence that the following claimed elements are disclosed in either of these two references: (1) the compression means claimed in each of these claims; (2) the subscriber unit claimed in claims 3–6 of the '863 patent, claim 1 of the '705 patent, and claims 162 and 178 of the '375 patent; (3) the synchronization means claimed in claim 1 of the '705 patent; and, (4) the half-duplex limitation present in claim 178 of the '375 patent.

### (i) *Compression Means*

The patents-in-suit disclose two types of compression means, RELP and SubBand Coding. [Tr. 2921]. The Kinoshita Japanese article discloses two different speech compression means, Adaptive Predictive Coding ("APC") and Adaptive Differential Modulation ("ADM"). [Tr. 3105; MTX 52A]. The 1983 NEC RSS publication discloses Adaptive Differential Pulse Code Modulation ("ADPCM") as a means for accomplishing speech compression. [Tr. 3759].

#### *1981 Kinoshita Japanese Reference*

■ On cross examination, Dr. Goodman testified that the APC compression means disclosed by the Kinoshita Japanese article was equivalent to the compression means disclosed in the patents-in-suit, [Tr. 3870–72], and the jury was entitled to credit this expert testimony.

ITC contends that Dr. Goodman's testimony regarding the structural equivalence of the Kinoshita compression means and the claimed compression means is inconsistent with his testimony that the VSELP compression means used in the accused products is not structurally equivalent to the claimed compression means. Dr. Goodman provided the following testimony in response to cross-examination on this alleged "double standard":

Q. On the invalidity side, you said Kinoshita disclosed APC vocoding, and that is the equivalent of the RELP. But then, when we got to the infringement side, you said, Oh no. But we can't say that VSELP and RELP are equivalent. Isn't that correct sir?

[objection by counsel omitted].

Do you disagree with that, sir? That is what you told this jury?

A. It's my opinion that Kinoshita—yes. I don't disagree. *It's my opinion that Kinoshita's teaching is sufficient to cover RELP, and that RELP doesn't cover VSELP.*

Q. It's kind of a double standard at work here, isn't it?

A. This is—this is my opinion about what is similar and what is quite different. The—in fact, I'm sorry to be a professor again, but adaptive predictive coding is itself a broad term and no less an authority than Dr. Atal, who has all these patents, uses the term adaptive predictive coding in a very well known paper.

And I was astonished myself, but he actually used it. When he described what he meant by it, it turns out to be the same as RELP. It's in one of the trial documents.

So perhaps Kinoshita was referring to adaptive predictive coding in the same way that Atal was. But certainly he said that there are elements of linear predictive, adaptive prediction. In any definition of adaptive predictive coding, there is—there is some sort of linear prediction taking place.

Q. And—

A. And it's not a big step to go to RELP from there.

[Tr. 3871–73 (emphasis added)]. The jury was faced with a choice between the testimony of Motorola's experts and ITC's position. On the factual issue of structural equivalency of the claimed compression means, both for

validity and infringement, the jury was entitled to credit the above testimony.

### 1983 NEC RSS Reference

Dr. Goodman testified:

the type of compression that's done in [the 1983 NEC RSS article] is 32 kilobits ADPCM. It's not identical to the RELP compression.

[Tr. 3759]. Because Dr. Goodman testified that ADPCM was not identical to RELP, the 1983 NEC RSS article may only anticipate if ADPCM is structurally equivalent to RELP. Much of the remainder of Dr. Goodman's direct examination testimony on compression means dealt with an obviousness analysis involving other prior art, the Atal and Un references. [Tr. 3759–61, 3784, 3798, 3811]. The sum of Dr. Goodman's direct testimony, therefore, is not sufficient to establish structural equivalency of APDCM to RELP because the subject was simply never broached. Motorola contends that testimony regarding structural equivalency was elicited, however, by ITC during its cross examination of Dr. Goodman:

Q. This Australian system['s compression means] was at 32 kilobits, wasn't it, sir?

A. Yes.

Q. In fact, it was a wave form coder. It wasn't a RELP, a VSELP, or any other kind of ELP, was it?

A. It was a wave form coder. It wasn't an ELP.

Q. Which is a completely different type of voice encoding, is it not, sir? It's not even a distant cousin to express your terms?

A. I'm going to have to be a professor again and say that this RELP is regarded as a hybrid coder. My colleagues told me don't dump this on the jury. If you're asking about it, it really includes wave form coding techniques, so the residual is, in fact, coded with a wave form coding technique that's very similar, if not identical—it's similar to the ADPCM. So there is a piece of a wave form coder there. And that's why I was giving it the name hybrid, because people couldn't figure out what it was. If you want to make these categories, I'll have to be a professor about it and tell you what I would tell my students.

[Tr. 3830–31 (cross-examination)]. Motorola contends that this testimony establishes that RELP is "very similar if not identical" to ADPCM and thus supports the finding of structural equivalency necessary for an overall finding of anticipation. [D.I. 324 at 23]. ITC contends that this is a distortion of this testimony, and argues that the "very similar" testimony is directed only to one facet of RELP compression means, the residual, and was not an opinion regarding structural equivalency. [D.I. 332 at 9 n. 9].

The Court finds that this testimony is insufficient to establish the structural equivalency of ADPCM. First, Dr. Goodman did not testify that the two compression means are structurally equivalent, and while the phrase "structural equivalency" need not be uttered as some sort of "magic words", the clear and convincing evidence standard requires at the very least that Dr. Goodman present the jury with some sort of comparison and conclusion regarding ADPCM and RELP. Dr. Goodman made no such comparison on direct examination, and Motorola stretches too far in contending that he provided it to the jury through the above-cited testimony, which merely discusses one aspect of the compression means without offering a conclusion as to the whole.

Because insufficient evidence supports the jury's verdict that the claimed compression means (or its structural equivalent) is disclosed in the 1983 NEC RSS reference, the Court will overturn the jury's verdict that the 1983 NEC reference anticipates claims 1 through 6 and 10 of the '863 patent, claim 1 of the '705 patent, and claims 91, 133, 162 and 178 of the '375 patent.

### (ii) Subscriber Unit

Claims 3–6 of the '863 patent, claim 1 of the '705 patent, and claims 162 and 178 of the '375 patent all contain limitations directed to subscriber units. ITC contends that neither the 1981 Kinoshita Japanese reference nor the 1983 NEC RSS reference can anticipate these claims because they do not disclose a subscriber unit.

*1981 Kinoshita Japanese Reference*

Dr. Cox testified that the 1981 Kinoshita Japanese reference did not contain a "subscriber unit block diagram", but further testified: "However, it is inconceivable that you would ever build a mobile radio base station that did not have a subscriber unit associated with it." [Tr. 3077]. While there are no block diagrams of subscriber units in the 1981 Kinoshita Japanese reference, there are numerous reference to subscriber units, which are referred to by Kinoshita as "mobile units." [*See, e.g.,* MTX 52A at 5 ("[T]he base station is the control station ..., while the mobile units are slave stations")]. On redirect, Dr. Cox testified that a person of ordinary skill in the art would understand that although the 1981 Kinoshita Japanese reference did not contain a block diagram of a subscriber unit, the system nevertheless would inherently include a subscriber unit which was "compatible with the parameters of the base station" and performed the same functions. [Tr. 3317–19].

■ The Federal Circuit has provided the following explanation of the principle of inherency:

> To serve as an anticipation when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence. Such evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill....
>
> Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient. If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient. This modest flexibility in the rule that "anticipation" requires that every element of the claims appear in a single reference accommodates situations where the common knowledge of technologists is not

recorded in the reference; that is, where technological facts are known to those in the field of invention, albeit not know to judges. It is not, however, a substitute for determination of patentability in terms of § 103.

*Continental Can Co. USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1268–69 (Fed.Cir.1991) (citations omitted). An important aspect of any inherency analysis is whether the missing element must necessarily be understood to be part of the reference. Mere possibilities or even probabilities are not enough to support a finding of anticipation. *Id.; see also Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1047–48 (Fed.Cir.), *cert. denied* — U.S. ——, 116 S.Ct. 516, 133 L.Ed.2d 424 (1995); *Electro Med. Sys. S.A. v. Cooper Life Sciences,* 34 F.3d 1048, 1052–53 (Fed.Cir. 1994).

■ The essence of Dr. Cox's testimony is that the subscriber unit claim limitations are necessarily disclosed by the 1981 Kinoshita Japanese reference to the extent these limitations are merely mirror images of identical base station limitations. He also testified that the Kinoshita article included references to mobile units and that it would be inconceivable to build a base station without mobile units associated with it. ITC makes no effort in its briefs to rebut or discredit this "mirror image" testimony with respect to claims 3–6 of the '863 patent, claim 1 of the '705 patent, or claim 162 of the '375 patent, and the Court thus finds that ITC has failed to show that their subscriber unit argument requires abrogation of the jury's anticipation findings for those claims.

Claim 178 of the '375 patent, however, contains a subscriber unit limitation requiring that the subscriber unit operate in half-duplex mode. Because Motorola concedes that the 1981 Kinoshita Japanese reference does not disclose half-duplex operation, either expressly or inherently, [D.I. 324 at 23 n. 8], the Court concludes that insufficient evidence supports the jury's verdict that claim 178 of the '375 patent anticipated by the 1981 Kinoshita Japanese article.

### 1983 NEC RSS article

The 1983 NEC RSS reference also does not contain "circuit" or "block" diagrams of subscriber units, but does refer to the existence of subscriber units. [See, e.g., MTX 98 at 11]. Dr. Goodman testified:

A. There is no circuit diagram [in the 1983 NEC RSS reference], no. The subscriber unit, as we've described—as has been described by various people here and, in fact, mentioned in the patent, is kind of a mirror image of some of the equipment in the base station, so that understanding how the base station works is a very good indication to someone with skill in the art of how to build a subscriber unit.

Q. So now you're saying the entire subscriber unit is implicit in Exhibit No. 98?

A. Yes.

[Tr. 3841]. The Court concludes for the same reasons as stated with respect to the 1981 Kinoshita Japanese reference that ITC has failed to demonstrate that their subscriber unit argument requires abrogation of the jury's anticipation findings with respect to claims 3–6 of the '863 patent, claim 1 of the '705 patent, or claim 162 of the '375 patent.

As with the 1981 Kinoshita Japanese reference Motorola concedes that the 1983 NEC RSS reference does not disclose the half-duplex limitation found in Claim 178 of the '375 patent and thus cannot anticipate this claim. [D.I. 324 at 23 n. 8]. For this reason the Court will vacate the jury's verdict that claim 178 of the '375 patent is anticipated by the 1983 NEC RSS reference.

### (iii) *Synchronization Means*

Claim 1 of the '705 patent contains the following "synchronization means" limitation:

means to determine synchronization between the base station and the subscriber stations utilizing a code for exchanging the current state of the connection there between, the link quality, and the power and timing adjustments.

ITC contends that neither the 1981 Kinoshita Japanese reference nor the 1983 NEC RSS reference disclose the four specific functions performed by the claimed synchronization means: state of connection, link quality, power adjustment, and timing adjustment.

### 1981 Kinoshita Japanese Reference

Dr. Cox testified on direct examination that the claimed synchronization means was disclosed in the 1981 Kinoshita Japanese reference: "The '81 Kinoshita reference does discuss the need for synchronization. That is one of the issues that Kinoshita was concerned with and discusses in that paper. So that is in there, yes." [Tr. 3140]. ITC contends that Dr. Cox's testimony cannot have been relied upon by the jury because the testimony does not specifically refer to the four functions described in the synchronization means limitation. ITC made no attempt, however, to raise this contention before the jury, either on Dr. Cox's cross-examination, during ITC's rebuttal case, or during closing argument. The Court finds that the jury was entitled to credit Dr. Cox's unrebutted expert conclusion that the claimed synchronization means was disclosed by the 1981 Kinoshita Japanese reference.

### 1983 NEC RSS Reference

On direct examination, Dr. Goodman testified that the 1983 NEC RSS reference "contains a means for determining synchronization and uses a code to—to control the synchronization", [Tr. 3811], but did not offer specific testimony regarding the four claimed functions. On cross examination, in response to a specific question regarding these functions, Dr. Goodman testified that they were not disclosed by the 1983 NEC RSS reference. [Tr. 3839].

Motorola argues that Dr. Goodman's testimony on direct examination supports a finding that the synchronization means was inherently present in the 1983 NEC RSS reference. The Court disagrees. Nothing in Dr. Goodman's direct examination testimony or in the reference itself indicates that any means for synchronization present in the prior art reference *necessarily* includes the four claimed functions. Moreover, Dr. Goodman specifically testified on cross-examination that it did not.

The Court finds that the record provides insufficient evidence to support a finding that

the 1983 NEC RSS reference discloses the claimed synchronization means and for this reason the Court will overturn the jury's finding that the 1983 NEC RSS article anticipates claim 1 of the '705 patent.

b. *1981 Kinoshita IEEE Article* [14]

The jury found that the 1981 Kinoshita IEEE article anticipated claims 162, 178, 213 and 219 of the '375 patent.

(i) *Claim 162*

▉ In the special verdict form, which contains Motorola's anticipation contentions, Motorola did not contend that the 1981 IEEE article anticipated claim 162. [D.I. 295 at 19–20]. Instead, Motorola contended that "the disclosure of the 1981 Kinoshita Japanese article, which implicitly would use a subscriber unit like that show in the 1981 IEEE Kinoshita article" anticipated claims 162 and 178. [D.I. 295 at 19]. The IEEE article contains a subscriber unit block diagram which is essentially a mirror image of a corresponding base station block diagram. The IEEE article was presented to the jury to clarify what Motorola contended was inherent in the 1981 Kinoshita Japanese reference. It was not presented to the jury as an anticipating reference with respect to claims 162 and 178.

Nevertheless, in filling out the special verdict form, the jury found that both the 1981 Kinoshita IEEE article and the 1981 Kinoshita Japanese article anticipated claim 162. In seeking to defend this portion of the jury's verdict Motorola now contends that, notwithstanding the contentions it placed in the jury verdict form, its expert Dr. Cox did indeed provide testimony from which a jury could conclude that the 1981 IEEE article anticipated claim 162. [D.I. 324 (citing Tr. 3073–77)]. The portion of Dr. Cox's testimony relied upon by Motorola, however, stands only for the proposition that the IEEE article is another paper describing Kinoshita's system. Dr. Cox did not testify that it provided the same disclosure as the 1981 Kinoshita Japanese article with respect to claim 162. For this reason, the Court finds that

Motorola did not in fact contend before the jury that the 1981 IEEE article anticipated claim 162 and that insufficient evidence exists to support this specific finding by the jury.

(ii) *Claim 178*

As previously discussed, Claim 178 depends from claim 162 and contains an additional limitation requiring the subscriber unit to operate in half-duplex mode. The jury's finding that claim 178 is anticipated by the 1981 Kinoshita IEEE article suffers from the same difficulties as discussed above with respect to claim 162. In addition, even if the Court were to assume *arguendo* that Motorola did present evidence at trial that the 1981 Kinoshita IEEE article and the 1981 Kinoshita Japanese article contained identical disclosures, Motorola concedes that the 1981 Kinoshita Japanese article does not disclose half-duplex operation. [D.I. 324 at 23]. The testimony elicited at trial as well as the Court's review of the 1981 Kinoshita IEEE article leads the Court to conclude that the IEEE article does not disclose half-duplex operation. For this reason the Court must conclude that sufficient evidence does not exist to support the jury's verdict that the 1981 Kinoshita IEEE article anticipated claim 178 of the '375 patent.

(iii) *Claims 213 and 219*

▉ The jury found that claims 213 and 219 of the '375 patent were anticipated by the 1981 Kinoshita IEEE article. This finding was supported by Dr. Cox's testimony that each of the steps found in these claims were disclosed in the reference. [Tr. 3168–69]. ITC contends that this testimony was insufficient because elsewhere Dr. Cox testified that the Kinoshita references did not disclose the compression means claimed by the patents-in-suit (including claims 213 and 219). Dr. Goodman did testify, however, that the Kinoshita compression means was structurally equivalent to the claimed compression means, [*see* discussion of compression means *supra*], and the jury was entitled to rely upon the combined testimony of Dr. Good-

**14.** Digital Mobile Radio Telephone System Using TD/FDMA Scheme, Koto Kinoshita *et al.,* Institute of Electrical and Electronics Engineers Con-

ference Record (International Conference On Communications—June 14–18, 1981). [MTX 46].

man and Dr. Cox in finding that the IEEE article anticipated claims 213 and 219.

### c. *The Adams Patent* [15]

 The jury found that claims 213 and 219 of the '375 patent were anticipated by the Adams patent. Dr. Cox did not offer detailed testimony regarding the Adams patent but rather testified that his opinion regarding anticipation was the same for the Adams patent as was for the IEEE reference. [Tr. 3169]. ITC contends that this testimony was insufficient because Dr. Cox did not "compare[ ] each separate element of the claim to the particular prior art reference being relied upon and point[ ] out where that element is found in the particular prior art reference." [D.I. 310 at 15]. Federal Rule of Evidence 705 does not require such particularized testimony from an expert.[16] *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1574–76 (Fed.Cir.1991). As the Federal Circuit has stated in discussing an obviousness analysis, which the Court finds to apply to anticipation analysis as well:

> While objective factual evidence going towards a § 103 determination is preferable to statements of opinion on the issue, the nature of the matter sought to be established, as well as the strength of the opposing evidence, must be taken into consideration in assessing the probative value of expert opinion. Opinion testimony rendered by experts must be given consideration, and while not controlling, generally is entitled to some weight.

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (1985), *cert. denied* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986) (citations omitted). In a jury trial, how much weight to afford the testimony is for the jury to decide. Lack of factual support for an expert opinion may undermine the opinion, *Id.*, but the responsibility for challenging the unstated factual underpinnings fell to ITC on cross-examination. *Symbol Technologies*, 935 F.2d at 1575–76.[17] ITC did not touch this area on cross-examination and thus cannot complain now that the jury was not entitled to accept this unrebutted testimony.

### d. *Conclusion—Anticipation*

In conclusion, the Court finds that sufficient evidence exists to support the jury's verdict that: 1) claims 1 through 6 and 10 of the '863 patent, claim 1 of the '705 patent and claims 91, 133, and 162 of the '375 patent are anticipated by the 1981 Kinoshita Japanese reference; 2) claims 213 and 219 of the '375 patent are anticipated by the 1981 Kinoshita IEEE reference; and, 3) claims 213 and 219 of the '375 patent are anticipated by the Adams patent.

The Court finds that insufficient evidence exists to support the jury's verdict that 1) claim 178 of the '375 patent is anticipated by the 1981 Kinoshita Japanese reference; 2) claims 1 through 6 and 10 of the '863 patent, claim 1 of the '705 patent, and claims 91, 133, 162, and 178 of the '375 patent are anticipated by the 1981 NEC RSS reference; 3) claims 162 and 178 are anticipated by the 1981 Kinoshita IEEE reference.

### 2. *Obviousness*

 A patent may also be invalidated for obviousness under 35 U.S.C. § 103. Under § 103, a Court must determine whether "the

---

15. U.S. Patent No. 4,020,461 (April 26, 1977) ("Adams patent").

16. Rule 705 states in relevant part:
 The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

17. The Court notes that in this respect the presentation of evidence necessary to establish invalidity and literal infringement may differ from the presentation of evidence necessary to establish infringement under the doctrine of equivalents. *Lear Siegler, Inc. v. Sealy Mattress Co. of Mich.*, 873 F.2d 1422 (Fed.Cir.1989) (requiring particularized presentation of evidence to establish infringement under the doctrine of equivalents); *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320 (Fed.Cir.1991), *cert. denied* 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992) (following *Lear Siegler*); *but see National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1191 (Fed. Cir.1996) ("neither *Lear Siegler* nor *Malta* requires any particular formulation [of evidence and argument]").

subject matter as a whole would have been obvious at the time the invention was made." [18] Obviousness is a question of law based upon factual inquiries established by the United States Supreme Court in *Graham v. John Deere*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). *See Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566–68 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Loctite*, 781 F.2d at 872; *Phillips Petroleum*, 673 F.Supp. at 1312. The factors to consider in determining whether obviousness is present include: 1) scope and content of the prior art; 2) differences between the prior art and the subject patent; 3) level of ordinary skill in the art at the time of the invention; and 4) secondary considerations such as commercial success, long felt but unresolved need, failure of others. *Graham*, 383 U.S. at 17, 86 S.Ct. at 693–94; *Loctite*, 781 F.2d at 872; *Mobil*, 779 F.Supp. at 1494.

 When performing an obviousness analysis, "[f]ocusing on the obviousness of substitutions and differences, instead of on the invention as a whole, is a legally improper way to simplify the often difficult determination of obviousness." *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir.1990). A court may not, with 20–20 hindsight, utilize an inventor's claims as a template and reconstruct his invention willy-nilly by picking and choosing elements at will from the prior art. *See In re Gorman*, 933 F.2d 982, 987 (Fed.Cir.1991). The "critical question, as § 103 makes plain, is whether the invention as a whole would have been obvious to one of ordinary skill in the art at the time it was made." *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

Motorola contends that ITC's briefing proceeds from the false premise that the jury did not combine references in reaching its obviousness verdict. The Court agrees with Motorola's characterization of ITC's briefing and disagrees with ITC's position. The jury clearly indicated the references it combined to find obviousness. ITC's briefing is not rendered valueless by this flaw, however, because ITC does discuss claim elements which ITC believes is absent from any of the prior art. To the extent that a given claim limitation is not found in *any* of the prior art individually it is not present in any combination of those references.

### a. *'863 and '705 Patents*

 The jury found that claims 1 through 6 and 10 of the '863 patent and claim 1 of the '705 patent were obvious in light of the combination of the 1981 Kinoshita Japanese reference, the 1981 Kinoshita IEEE reference, and the 1983 NEC RSS reference. The Court has upheld the jury's verdict that the 1981 Kinoshita Japanese reference anticipates these claims. Anticipation is the epitome of obviousness, *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.Cir.1983), and thus the Court finds that substantial evidence exists to support the jury's obviousness verdict.

### b. *'089 Patent*

The jury found that claims 1, 6 through 9, 11, 12, and 15 were obvious in light of the combination of the 1981 Kinoshita Japanese reference, the Henry and Glance reference, the White patent, and the 1983 NEC RSS reference. Motorola had not contended that these claims were anticipated by any of these claims.

#### (i) *Independent Claim 1*

Claim 1 is nearly identical to other claims which were held to be anticipated by prior art except for an additional limitation requiring that the subscriber unit operate in a "half-duplex" mode:

> ... each subscriber station operating in a half-duplex mode within a time division multiple access frame wherein it transmits

**18.** Section 103 provides in pertinent part:
a patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.
35 U.S.C. § 103.

in one portion of said frame and receives in another portion of said frame.

█ The jury found that claim 1 was obvious in light of the combination of the 1981 Kinoshita Japanese reference, the 1983 NEC RSS reference, the Henry and Glance reference, and the White patent. This verdict was supported by the testimony of Dr. Cox. [*See, e.g.* Tr. 3121–24]. ITC attempts to discredit this testimony by characterizing it as relying upon the discredited "obvious-to-try" standard. [D.I. 332 at 11 (citing *In re Deuel*, 51 F.3d 1552 (Fed.Cir.1995); *In re Dow Chemical*, 837 F.2d 469 (Fed.Cir.1988); *In re O'Farrell*, 853 F.2d 894 (Fed.Cir. 1988)) ]. After reviewing the entirety of Dr. Cox's testimony on this subject, the Court finds that Dr. Cox was not using 20–20 hindsight or employing an impermissible "obvious to try" standard. Indeed, Dr. Cox specifically testified that a person of ordinary skill in the art would have understood the benefits of half-duplex operation (saves filtering in the subscriber set and makes the subscriber set simpler) and would have applied the teachings of the Henry and Glance or White papers to the TDMA system of Kinoshita. [Tr. 3123]. This testimony supports a conclusion that claim 1 was obvious in light of those references.[19]

### (ii) *Claim 6*

Claim 6 depends from independent claim 1 and adds a "spatial diversity" limitation:

> The system of claim 1, wherein said system is provided with spatial diversity, said spatial diversity comprising a plurality of antennas selectively spaced from each other to provide relatively high signal reception despite signal fading.

█ Dr. Goodman testified that the use of spatial diversity was well known in the prior art:

Q. First, with respect to claim 6, do you have an opinion as to whether the additional elements set forth in claim 6 of the '089 patent is shown here are not in the [1983 NEC RSS reference]?

A. I believe they discuss diversity. The

Australian Telecom equipment contains diversity reception at the base station. I'm afraid I might have to refer to my notes for that, Mr. Krupka.

Q. Could you do that?

A. I forget which references disclose that. I'm sorry. I don't want to take the time of the Court or everyone else right now. The base station or diversity reception is really an obvious option for anyone building a system of this kind in the 1983 time frame. It was present in analog cellular systems from day one. So I would say it is invalid on the basis of obviousness.

Q. Do you have an opinion as to whether it would have been obvious to someone of ordinary skill in the art in the time frame 1983 to include spatial diversity as called for in claim 6 of the '089 patent with the elements disclosed in [the 1983 NEC RSS reference]?

A. Yes. That would have been an obvious thing to build into a system of that kind.

[Tr. 3803–04]. ITC contends that Dr. Goodman testified that spatial diversity was not disclosed in the 1983 NEC RSS reference. This is true, and Dr. Goodman freely admitted as much on cross examination. [Tr. 3837]. Dr. Goodman also testified, however, that spatial diversity was a well known concept to one of ordinary skill in the art, and indeed spatial diversity and its benefits are prominently discussed in the Henry and Glance reference, [MTX 65 at 1895–97], which was part of the combination relied upon by the jury. The Court finds that sufficient evidence exists to support the jury's obviousness verdict with respect to claim 6.

### (iii) *Claim 7.*

█ Claim 7 depends from claim 1 and adds a limitation requiring "simulated simultaneous two-way transmission of multiple signals on a single pair of channels" at the subscriber station. The Court finds that the testimony of Dr. Cox and Dr. Goodman on this subject supports a finding of obviousness:

---

19. The only other contention raised by ITC with respect to Claim 1 has to do with the compression means limitation and has been addressed *supra* as part of the Court's anticipation analysis.

Q. Now, with respect to Claim 7 of the '089 patent . . . does the [1981 Kinoshita Japanese reference] disclose the element that is described there?

A. Well, that is the—the two-way transmission at different times again. And I think we have to look at the Henry, Glance or White, a reference to find that particular—

Q. Do you have an opinion as to whether or not it would have been obvious to someone of ordinary skill in the art in 1983 to combine either the disclosure of the Henry and Glance reference or the White reference with the 1981 Kinoshita reference to yield this result (indicating)?

A. Since those references talk about transmitting and receiving at different times, I think it would be evident to one building such a system that it would be advantageous not to transmit and receive at the same time, as I have indicated before when we discussed that item. So I think it would have been obvious to do that.

[Tr. 3136 (Dr. Cox); *see also* 3804–05 (Dr. Goodman) ].

### (iv) *Claims 8, 9 and 11*

■ Claim 8 depends from claim 1 and adds a limitation requiring the information signal to undergo "phase shift keying" modulation prior to transmission. Claims 9 and 11 each further depend from Claim 8 and specify that the modulation technique be "multiphase phase shift keying" and "four level QPSK respectively." [20]

Dr. Cox testified that these forms of modulation were not disclosed in the 1981 Kinoshita Japanese reference, but also testified that they were disclosed in another prior art reference, a 1979 Kinoshita paper, and that it would be obvious to one of ordinary skill in the art to combine the modulation teachings of the 1979 article with the system found in the 1981 reference. [Tr. 3124–27]. This testimony, if relied upon by the jury, would be sufficient to support a finding of obviousness. The jury did not, however, list the 1979 Kinoshita reference as one of the references which rendered claims 8, 9, and 11 obvious.

The jury was requested to list all prior art which played a role in its obviousness verdict, and the Court is bound to interpret a failure to list a reference as indicating that it played no role in the jury's decision. The testimony supports Motorola's conclusion, but the verdict does not. Motorola's chart during trial had to be modified to reflect the testimony, but Motorola's contentions in the special verdict form never captured the changes made to the chart to conform it to the testimony. [*See* Tr. 3127–31, 3808].

Dr. Goodman also presented sufficient testimony regarding modulation techniques. [Tr. 3807–10]. Unfortunately for Motorola this testimony was based upon a reference, [MTX 204], that was not presented to the jury in the contentions section of the special verdict form and was not relied upon by the jury in reaching its verdict. The only testimony offered by Dr. Goodman which was not linked to this reference was the conclusory and inadequate statement "Even if they hadn't read [MTX 204] it would have been obvious." [Tr. 3810]. The Court finds that given the prior art the jury stated it relied upon, insufficient factual evidence exists to support a legal determination that claims 8, 9, and 11 were rendered obvious by the combination of the 1981 Kinoshita Japanese reference, the Henry and Glance reference, the White patent, and the 1983 NEC RSS reference. Because Motorola failed to meet its burden and prove invalidity by clear and convincing evidence the Court will reverse the invalidity verdict as to these three claims.

### (v) *Claim 12*

■ Claim 12 depends from claim 1 and contains an additional limitation specifically restricting the compression means to a RELP. As discussed previously by the Court, sufficient evidence exists to support a finding that the compression means disclosed in the 1981 Kinoshita reference is structurally equivalent to a RELP. For this reason, the Court finds that sufficient evidence exists to support the jury's finding that this dependent claim was obvious in light of the listed prior art.

20. "QPSK" stands for "quadrature phase shift keying."

#### (vi) *Claim 15*

Claim 15 depends from claim 1 and contains a limitation requiring a "means for transmitting synchronizing information" from the base station to the subscriber units. This claim is somewhat similar to the previously discussed synchronization means limitation found in claim 1 of the '705 patent, but differs in that it is not as detailed. While claim 1 of the '705 patent describes four separate functions which must be performed by the synchronization means (state of the connection, link quality, power, and timing adjustments) claim 15 simply requires that the synchronization means "align incoming signals at the base station from said subscriber stations to accommodate variations in distance between the individual subscriber stations and the base station." As discussed previously, sufficient evidence supports the jury's finding that the more detailed synchronization means in claim of the '705 patent is disclosed in the 1981 Kinoshita Japanese reference. The Court finds that this same evidence supports a finding that claim 15 is obvious in light of the prior art cited by the jury.

#### c. *'375 Patent*

The jury found that: 1) claims 91, 133, 162, and 178 were obvious in light of the combination of the 1981 Kinoshita Japanese reference, the 1981 Kinoshita IEEE reference, and the 1983 NEC RSS reference; and, 2) claims 213, 218, 219, and 224 were obvious in light of the 1981 Kinoshita Japanese reference, the Adams patent, the Henry and Glance reference, and the White patent.

#### (i) *Claims 91, 133, 162, 213 and 219*

The Court has upheld the jury's verdict that the 1981 Kinoshita Japanese reference anticipates claims 91, 133, and 162 and that the 1981 Kinoshita IEEE reference and/or the Adams patent anticipate claims 213 and 219. Anticipation is the epitome of obviousness, *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.Cir.1983), and thus the Court finds that substantial evidence exists to support the jury's obviousness verdict as to these claims.

#### (ii) *Claims 178, 218 and 224*

These claims depend from claims which the jury invalidated on both anticipation and obviousness grounds. The Court has upheld the jury's verdict with respect to these underlying independent claims. Claims 178, 218 and 224 each add an identical limitation requiring that the subscriber units send and receive at different times, i.e., operate in half-duplex mode. The Court finds sufficient evidence supports the jury's obviousness verdict with respect to these claims for the reasons stated *supra* in the Court's discussion of claim 1 of the '089 patent.

#### d. *Conclusion—Obviousness*

ITC's motion for judgment as a matter of law on the jury's obviousness findings is denied with respect to claims 1 through 6 and 10 of the '863 patent, claim 1 of the '705 patent, claims 1, 6, 7, 12, and 15 of the '089 patent, and claims 91, 133, 162, 178, 213, 218, 219, and 224. ITC's motion is granted with respect to claims 8, 9, and 11 of the '089 patent.

### V. *ITC'S RULE 59(a) MOTION FOR A NEW TRIAL*

 Pursuant to Federal Rule of Civil Procedure 59(a), a new trial may be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law ·in the courts of the United States...." The decision as to whether to grant or deny a motion for a new trial is committed " 'almost entirely to the exercise of discretion ... of the trial court.' " *Registration Control Systems v. Compusystems, Inc.*, 922 F.2d 805, 809 (Fed.Cir.1990) (quoting *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190–91, 66 L.Ed.2d 193 (1980)). A "new trial should only be granted where a 'miscarriage of justice' would result if the verdict were to stand, the verdict 'cries out to be overturned' or where the verdict 'shocks our conscience.' " *Smith v. Delaware Bay Launch Serv., Inc.*, 842 F.Supp. 770, 778 (D.Del.1994) *aff'd* 54 F.3d 770 (1995) (citing *Cudone v. Gehret*, 828 F.Supp. 267, 269 (D.Del.1993)); *see also China Resource Prod. Ltd. v. Fayda Int'l, Inc.*,

856 F.Supp. 856, 862 (D.Del.1994). A new trial may be granted even if the Court denies ITC's motion for judgment as a matter of law, because separate standards apply to each motion. *American Bearing Co. v. Litton Indus., Inc.*, 729 F.2d 943, 948 n. 11 (3d Cir.), *cert. denied* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984).

In addition to the grounds previously raised by ITC in its motion to amend and in its JMOL motion, ITC also makes the following allegations in support of the new trial motion: 1) the verdict was against the weight of the evidence; 2) admissible evidence was improperly excluded at trial and inadmissible evidence was improperly admitted at trial; 3) the Court's time management unjustly prejudiced ITC (by permitting ITC to renege on its representation that it could try the case in the time allotted, by adding three additional days to the trial, and by abandoning its prior ruling that each party would have half of the available trial time so that ITC could have additional time?); 4) Motorola made improper and prejudicial statements during closing argument; and, 5) the Court erred in its response to certain notes submitted by the jury during its deliberations. Motorola opposes ITC on each of these issues, and not surprisingly contends that the Court's rulings were correct or at the most constituted harmless error.

### A. *The verdict was not against the weight of the evidence.*

The Court is aware that denial of a motion for JMOL does not necessarily lead to a denial of a new trial on the grounds that the verdict was against the weight of the evidence, because these two motions utilize different legal standards. Nevertheless, after long and careful review of the evidence, the Court finds that the jury's verdict, except as specifically stated by the Court *supra* during its discussion of ITC's JMOL motion, is not against the weight of the evidence and is amply supported by the evidence. Indeed, the verdict rendered in this case was a remarkable feat considering the breadth and depth of the subject matter and the evidence. Accordingly, the Court finds that this ground does not support ITC's motion for a new trial.

### B. *Admissible evidence was not improperly excluded at trial and inadmissible evidence was not improperly admitted at trial.*

ITC lumps together under this rubric a number of objections which have previously been ruled upon by the Court either prior to trial or during trial. [D.I. 310 at 44–50 (Part E)]. The Court relies upon its previous rulings on these issues and need not repeat those rulings here. The Court finds that these items do not warrant a new trial.

ITC does raise two objections, however, which distort events at trial and merit further response by the Court: 1) the Court's supposed instruction to counsel for ITC requiring him to abandon cross-examination of Dr. Cox regarding Motorola's demonstrative claim charts; and 2) the Court's alleged striking of an ITC demonstrative exhibit because of a "typographical" error.

#### 1. *Dr. Cox and the Motorola demonstrative claim charts.*

Motorola utilized a number of demonstrative claim charts at trial which were referred to extensively by both Dr. Cox and Dr. Goodman during their testimony. For the most part each chart addressed one independent claim or several dependent claims. The Court will refer to the chart for claim 10 of the '863 patent as an example. The chart is divided into three columns. The center column is captioned " '863 Patent" and contains the text of Claim 10. The chart uses underlying colored bands to separate the claims into its eight constituent limitations. The left column is captioned "Motorola does not infringe" and contains four subcolumns, one for each of the accused product lines (GSM, JDC, MIRS, USDC). As originally prepared, the four subcolumns and the eight limitations form a grid and each cell in the grid contains the word "No," and each "No" is covered by a peel away sticker. The right column is captioned "InterDigital Is Invalid" and contains subcolumns for each of the principal prior art references relied upon by Motorola. In each of these cells is the word

"Yes," or in some instances "Yes or [some other prior art reference]" which indicates that the specific limitation is found in either the reference at the top of the column or the additional reference. Each "Yes" is also covered by a peel away sticker.

At trial, the charts were initially placed before the jury with all the "No" and "Yes" cells covered by stickers. As Dr. Cox testified that a specific limitation in an independent claim was not present in a certain accused product, a sticker was removed and the appropriate "No" was uncovered. For dependent claims, when Dr. Cox testified that the claim was not infringed because its independent claim was not infringed, a sticker would be removed and the appropriate "No" would be uncovered. Likewise, as Dr. Cox testified that a certain limitation was present in a prior art reference, a sticker was removed and the appropriate "Yes" was uncovered.

The confusion regarding these charts arose from three factors. First, in order to save time during direct examination Motorola's counsel did not peel away each sticker as testimony was elicited, but instead left them on anticipating that they would be removed later to conform the charts with the testimony. Second, the copies of the charts which were provided to ITC before trial were apparently not accompanied by an explanation that "No" did not have the same meaning on independent claims as it did for dependent claims. Third, ITC was apparently not aware that the "No"'s and "Yes"'s would be covered up with stickers and that not all of the "No"'s would actually be uncovered during the course of Dr. Cox's testimony. Because they did not understand the nature in which the charts would be used, ITC anticipated that Dr. Cox's testimony would be inconsistent with Motorola's discovery responses. By way of example, the chart for claim 10 of the '863 patent contains a "No" in the cell for the "plurality of transmit channel circuits" and JDC products. Under ITC's assumption of how the charts would be used, the jury would be provided with testimony that this element was not present in the JDC products, which would be inconsistent with Motorola's discovery responses in which they admitted that JDC products did contain this limitation.

Unfortunately for ITC, Motorola's direct examination of Dr. Cox did not proceed as assumed. Using the same example, Dr. Cox *never* testified that the plurality of transmit channel circuits element was not present in JDC products, but relied instead on the absence of other limitations to support his conclusion that the JDC products did not infringe claim 10. The strip covering the JDC/plurality of transmit channel circuits "No" was never removed and the jury never saw it.

Despite the fact that the jury was never presented with testimony regarding this "No", the Court still refused to preclude ITC from referring to it on cross-examination, under the theory that the charts as provided to ITC were a representation by Motorola of its contentions, and if ITC's understanding of the meaning of the chart format was correct, the charts were inconsistent with positions taken by Motorola at other times and was thus suitable impeachment material. The Court required, however, that ITC distinguish between questions relating to Dr. Cox's actual trial testimony presented to the jury and questions relating to portions of the chart as presented to ITC but never seen by the jury.

Admittedly, this distinction was made more difficult because all the stickers had not yet been removed to conform the charts to Dr. Cox's testimony when ITC began its cross-examination. This difficulty was substantially ameliorated, however, by the fact that this portion of Dr. Cox's cross-examination followed an overnight recess during which ITC had access to the expedited transcript ("the daily copy") of Dr. Cox's direct examination. ITC thus had the ability to distinguish between what Dr. Cox said to the jury and what ITC wished to raise for the first time as impeachment. Nevertheless, counsel for ITC willfully or carelessly blurred this distinction and misrepresented Dr. Cox's testimony to the jury. For example, counsel questioned Dr. Cox about the "No" under the sticker for JDC/plurality of transmit channel circuits and after eliciting that the "No" was present misrepresented

that Dr. Cox's testimony was that the JDC products did not contain a plurality of transmit channel circuits. [Tr. 3262]. Counsel for Motorola pointed out this distortion, [Tr. 3264], but ITC would not recognize that a problem existed with his questions, thus requiring the Court to rule that ITC had to abandon using the claim charts until counsel clarified what Dr. Cox had testified to before the jury and what ITC was now introducing for the first time as impeachment. The Court stands by this ruling. Having complicated the trial and increased the likelihood of jury confusion by refusing to limit the number of claims-in-suit to a sensible number, ITC had a duty to conduct its cross-examination in a manner that did not exponentially increase the likelihood of jury confusion. The Court finds no merit in ITC's objection.

2. *ITC's misrepresentation of its position to the jury through use of trial exhibit 2523.*

▮▮▮ ITC utilized a summary demonstrative chart at trial entitled "Motorola Products—How They Infringe." [ITCX 2523]. This chart purported to identify, for each claim and each product line, whether ITC claimed that Motorola directly infringed, contributed to the infringement of a third party, or induced infringement by a third party. This exhibit was prominently displayed in front of the jury for hours at a time during ITC's case-in-chief. As more and more testimony was elicited by ITC, the Court became aware that the positions taken by ITC's witnesses regarding infringement did not appear to match the paper copy of the chart which had been provided to the Court. Because the large chart before the jury was not placed in easy view of the Court, I maneuvered carefully to observe the large chart without interrupting the proceedings. I confirmed that the large chart matched my copy and appeared to differ from my written notes regarding the testimony.

Either because they noticed my efforts or because they had their own reasons for reexamining the chart, ITC raised the issue of the chart's inaccuracies at the next recess. ITC commented that the chart contained several typographical errors. Specifically, ITC

noted that the chart indicated that Motorola's PDC and GSM products infringed claims 168 and 173 of the '375 patent when these claims were not even at issue in the trial. These claims should have been 162 and 178.

ITC now contends that it is because of these typographical errors that the Court struck this chart. This argument severely mischaracterizes the record and ignores the stated reason for the Court's ruling. As the Court explained to counsel for ITC:

THE COURT: Under the ESMR, under the '375 patent, I thought I heard your expert talk about contributory infringement with regard to [claim] 91 and 133, at least.

MR. HOFFMAN: What he's indicated is that Motorola does do direct infringement. Also when it's sold, there is also contributory [infringement].

[Tr. 2482].

The chart indicates only that Motorola's ESMR products directly infringes these claims, and says nothing about contributory infringement of these claims by this product. In a further colloquy with counsel for ITC, the Court made clear that it was this inconsistency, not typographical errors, which concerned the Court:

MR. HOFFMAN: ... I mean, what it is is a—is typos that were never picked up.

THE COURT: I don't know. I don't know about the typos. I just heard the testimony. And the chart didn't conform to the testimony.

MR. HOFFMAN: Okay. Fine. We'll go ahead and conform it to the testimony, your Honor.

[Tr. 2483–84].

After the lunch recess, however, ITC had only fixed the typographical errors and was only concerned with those errors. [Tr. 2490–91]. I pointed out another inconsistency between the chart and the testimony as reflected in my notes:

THE COURT: My notes indicate Claim 1 of the '089 patent [is infringed by ESMR products] directly and contributorily.

[Tr. 2492]. The chart indicates only contributory infringement. ITC responded that the

summary chart was not inconsistent with the testimony, but rather the testimony merely provided more information that was found on the chart summarizing that testimony. [Tr. 2493, 2495–97].

ITC claims that charts which are meant to summarize its different grounds for recovery do not have to actually summarize the testimony. The Court found this position, however, to be incredible and for this reason struck the chart. At the time, the Court was in the middle of a trial day without access to transcript for all of the morning testimony. Faced with the necessity of making a ruling, the Court had to act on the information available to it. The Court had identified several inconsistencies which were verified by ITC's counsel. The chart was propped up not 10 feet from the jury captioned "How Motorola Infringes." The possibility for jury confusion was manifest, especially given the already large and confusing number of claims placed before the jury at ITC's demand. The Court expressed its concerns a number of times and counsel for ITC could not or would not address them. The Court was well within its discretion in striking this exhibit.

## C. *The Court's allocation of time was fair and proper.*

ITC's briefing on this issue appears based upon the premise that a Court is in error if it refuses to grant a civil litigant an unlimited amount of time to present its case. To this end, ITC provides a number of black-letter law truisms and then offers affidavits from counsel describing what they would have done with more time. ITC's position is factually deficient, legally deficient, and in the factual context of this trial verges on frivolousness.

Few judges set trial limits in a vacuum. This Court's practice is to request an estimate from counsel early in the litigation and to accept this representation as being made in good faith unless the facts or the nature of the case indicates otherwise. On March 7, 1994, ITC and Motorola filed a "Joint Submission Concerning Discovery and Scheduling" in which they stated "[t]he parties currently anticipate that trial will last 10–15 trial days." [D.I. 36 at 4]. In reliance upon the parties' joint representation the Court scheduled a three week trial, the outside limit of the range proposed by the parties. [D.I. 38].

As discovery progressed ITC never notified the court that three weeks would be inadequate. On January 9, 1995, the Court emphasized the importance of concluding the trial within the allocated three week period:

If this Court were dealing in cases that took one, two, three, four days of trial, typically negligence cases or criminal law cases, the allocation of time would not be a serious problem. But principally dealing with complicated cases, patent cases are in this Court probably about the third or fourth highest in the country. That requires large blocks of time. Time becomes a very, very critical matter, because once there is any runover or a complication with scheduling, it becomes a massive problem to reallocate time, either before or even after trial commences.

So I have become very conscious about that.

. . . .

Now, the way I work allocation is that every time somebody opens their mouth, their side is clocked. And my deputy, my courtroom clerk will keep the time. . . . If I get towards the end of the trial and I am one or two hours off from the allocable shares that we have talked about, I am not going to be concerned too much one way or the other. But if I start running a day behind and somebody is taking a lot more time than we anticipated, then we are going to have to take some drastic measures, and that is just put a time limit on examination or cross-examination. I find that that is just absolutely necessary with the calendars we have here.

[1/9/95 conference, Tr. 52–54]. ITC did not object to this procedure and did not inform the Court that the parties' three week estimate was inadequate.

On January 23, 1995, ITC indicated that it was ready to go to trial, but did not inform the Court that more trial time was needed. [1/23/95 conference, Tr. 11]. ITC also informed the Court that it was unwilling to try

any fewer than 38 claims, in response to which the Court expressed concerns about the adequacy of the scheduled time:

Just by allowing you to speak, the words themselves indicate to everybody present that there is no way in three weeks ITC can present their case on 38 claims. . . .

Now, when I asked about a representative group [of claims], I was taking into consideration the fact that when we bring a jury in here and we tie these people up for three weeks, we make a commitment to them, because they've got commitments. . . . And there is no way that I'm going to give you an open-ended trial, so that you get started on this thing and then we just go until its done.

We've all made a commitment that we were going to put aside three weeks. I've made commitments to other lawyers, to other trials that follow this, and the jury has been given an idea about the length of this when we gave them notice when they should appear.

Now, Mr. Hoffman, how would you present the trial on 38 claims in the 15 days that have been allotted for trial and providing ample time for cross-examination and any rebuttal?

[1/23/95 conference, Tr. 13–14]. Mr. Hoffman's explanation did not include a request for more trial time: "In fact, your Honor, we have every intent of trying this case within 15 days. We understand the Court will have us on a watch. And we intend to live by it and will live by it." [1/23/95 conference, Tr. 15–16]. And in response to further concern by the Court regarding the adequacy of time, Mr. Hoffman stated "I don't see where there should be a problem on 38 claims. . . . [S]ince we'll be on a stopwatch, I think that's a problem we're going to have to live with." [1/23/95 conference, Tr. 37–38].

At the pretrial conference on January 26, 1995, ITC again informed the Court that it did not want to try any fewer than 38 claims, [1/26/95 conference, Tr. 76], and the Court once again expressed doubts as to whether the scheduled time would be adequate:

[W]e've made a contract about how long this case is going to try. And I had very, very serious qualms about the length of

this trial. We made a contract with each other. We made a contract with the Court and its personnel, with my calendar, with the jurors that we're going to call in this case. . . . And I have very serious doubts if we can try this case with those number of claims involved.

[1/26/95 conference, Tr. 88–89]. ITC did not indicate to the Court that it agreed with the Court's concerns and wanted more trial time, but instead raised only the subject of whether the trial could be postponed for a short period of time and rescheduled into a similar time slot. [1/26/95 conference, Tr. 176].

On February 1, 1995, the Court postponed the trial due to the inadequate preparation by the parties. Trial was rescheduled for March 2, 1995.

On February 8, 1995, the Court twice offered to reopen discovery and postpone trial for six months to a year, [2/8/95 conference, Tr. 10, 170], which would have allowed the length of the trial to be revisited. ITC did not accept this offer.

On February 9, 1995, pressed by both parties for an early trial date, the Court confirmed that trial would run for 15 days beginning March 2 and ending March 22, with the final day reserved for summations and jury instructions. The Court stated "this is the schedule we have to keep" to which counsel for ITC responded "Fine, your Honor." No request for additional time was made and nothing was said to indicate that ITC was at all troubled by the allotted trial time. [2/9/95 conference, Tr. 117–118]. The Court also informed the parties that trial time would be split 50–50, to which counsel for ITC replied "neither side can say that that is unfair." [2/9/95 conference, Tr. 118–119].

Finally, on February 27, 1995, the Court summarized the current status of the allocated trial time issue: "[W]e'll be faced with time problems, but both parties have agreed to be bound by the time limits, and I intend to hold you to your word." Counsel for Motorola stated "I'm happy to be bound by those words" and counsel for ITC stated "we would echo those sentiments." [2/27/95 conference, Tr. 44].

As these excerpts demonstrate, the Court expressed serious concerns on a number of occasions regarding whether 15 days would be enough time. ITC's counsel represented to the Court that 15 days was adequate and that it understood what would happen if they misused their time. The Court relied upon these representations in making its determination that the case was ready to go to trial on March 2, 1995 and made clear that ITC's counsel would be held to their representations.

Counsel for ITC reneged on their representations even before their first witness left the stand. At the end of the first full day of testimony the Court inquired as to whether ITC's counsel was keeping up with the schedule they had set for themselves. The Court asked this question because, although there had been very few interruptions and ITC had been completely in control of the pace of the trial, ITC's case appeared to be moving quite slowly. ITC's counsel responded that they were not keeping up with their schedule, that they would need more time, and that failure to provide more time would impinge upon their client's constitutional rights. The Court informed counsel that they would be held to their word, the time limits would be enforced as per ITC's previous agreement. [Tr. 528–31].

Despite this warning, ITC continued to utilize far more than its share of the allocated trial time. In an attempt to be flexible the Court added two full trial days plus a partial trial day on a Saturday. [Tr. 2615–21]. Nevertheless, with only four trial days plus the partial Saturday trial day remaining, ITC had used up six hours (practically one full trial day) more than Motorola. It was at this point, in the face of ITC's continued unwillingness or inability to control their case, that the Court ordered that one fourth of the time difference would be made up each remaining trial day. [3216–17]. This extraordinary step was necessary because of the prejudice which ITC's intransigence was causing to Motorola and to the agreed upon trial schedule, even with the additional time. As a result of the Court's actions, when Motorola rested its case-in-chief on Tuesday, March 21, 1995, the gap had been cut to two and a half hours. The Court then forced Motorola to accept this disparity and allocated each side one half day for rebuttal and surrebuttal, and one half day each for damages.

Finally, during closing arguments, counsel for ITC stated to the jury that he did not have enough time but then did not use all of the available time. [Tr. 4428, 4439, 4471].

The Court's inherent power to control cases before it includes the power to set time limits for a trial. *Duquesne Light Co. v. Westinghouse Electric Corp.*, 66 F.3d 604, 609 (3d Cir.1995). "[T]he courts need not allow parties excessive time so as to turn the trial into a circus. After all, a court's resources are finite and a court must dispose of much litigation. In short, the litigants in a particular case do not own the court." *Id.* at 610. The Court's review of the case law on this subject indicates that the following factors, although by no means exclusive, are important in evaluating the reasonableness of a Court's time limits: (1) was the time limit established arbitrarily or in consultation with the parties; [21] (2) was the trial time allocated evenhandedly; [22] (3) did the Court allow the party to fill its allotted time with whatever evidence the party deemed appropriate, subject only to the rules of admissibility; [23] and (4) was the time limit applied flexibly.[24] To these the Court would add a fifth factor, whether the parties received timely notice of the consequences of failing to meet the time limits.

The three week time limit was not only established in consultation with the parties, the Court adopted the outside limit proposed by the parties. The trial time was split 50–50 not as a result of an arbitrary or impulsive decision, but rather only after the Court spent a period of days considering whether the issues to be proven at trial

21. *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 473 (7th Cir.1984).

22. *Duquesne Light*, 66 F.3d at 610.

23. *Id.*

24. *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1171 (7th Cir.), *cert. denied* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

justified a nonequal split and rejected this possibility. The Court did not tell ITC how to present its case. Instead, the Court let ITC present its case and only stepped in to enforce the time limits when it became clear that counsel for ITC were unable or unwilling to do so themselves. If ITC found itself running short on time during Motorola's invalidity case this is because the Court let counsel decide for themselves how much time they would spend on their case-in-chief. The Court was flexible and even added substantial time to the trial schedule. Finally, the Court made clear at every stage of the litigation what the consequences would be if a party mishandled their time and furthermore made clear that the Court's calendar limited its ability to turn this proceeding into an open-ended trial.

The Court cannot explain why Motorola was able to present its case in the time provided and yet ITC claims it could not. Perhaps it was differences in the composition of the parties' trial teams. Perhaps ITC thought that black letter law advising against a Court limiting cross-examination would allow them to spend all their allotted time on their case-in-chief and then demand more time as a constitutional right. The Court is no less puzzled by ITC's trial strategy today than a year ago.

The Court does not have to understand ITC's trial strategy, however, to rule on ITC's motion. ITC requested three weeks. The Court scheduled a three week trial. In extensive pretrial proceedings ITC never requested more trial time and despite repeated inquiries from the Court continued to maintain that three weeks would be adequate. ITC maintained this position even when the Court made clear that the only way the trial could be rescheduled as planned was if three weeks was an adequate estimate. And once trial started, the Court did not hold ITC to its word, but instead inconvenienced the jury, ignored Motorola's reasonable expectation that the case would be tried as agreed, in-

creased the delay and prejudice to all the other litigants on the Court's docket, and substantially expanded the trial time to aid ITC. The Court finds ITC's contention that the time limits imposed require a new trial to be absolutely without merit.

### D. *ITC has waived its right to object to Motorola's closing argument.*

 ITC alleges in its post-trial briefing that counsel for Motorola made eleven erroneous statements in his closing argument "which rendered the trial unfair and were unduly prejudicial to ITC." [D.I. 310 at 52]. Objections to an opposing counsel's closing arguments, however, are waived if not objected to at trial. *Dunn v. HOVIC*, 1 F.3d 1371, 1377 (3d Cir.), *op. mod. in part* 13 F.3d 58, *cert. denied* 510 U.S. 1031, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993). The purpose for this requirement is simple: to afford the Court an opportunity to evaluate the objection and take any action necessary to correct any prejudice resulting from any objectionable statements.

ITC objected twice during Motorola's closing argument, and did not raise any of the eleven objections now found in its brief. [*Compare* Tr. 4391, 4407 *with* D.I. 310 at 52–54].[25] ITC did not object at the conclusion of counsel's closing argument, [Tr. 4427–28], at the conclusion of all closing arguments, [Tr. 4441–42], before the jury was charged, [Tr. 4471–77], after the jury was charged, [Tr. 4553–65], or during any of the conferences during the jury's deliberations. [Tr. 4566–4620]. The Court finds that ITC made no attempt to raise these objections when something could have been done about them and, consequently, they are waived.

### E. *The Court's response to the jury notes was proper.*

1. *"Can we find that patents are valid & there is no infringement?"*

] After consultation with counsel, the Court responded "yes" to this jury note

---

**25.** ITC's first objection related to Motorola's reference to an exhibit which was not in evidence. The Court sustained this objection and instructed the jury to disregard the objectionable statement. [Tr. 4391–96]. ITC's second objection related to whether certain prior art relied upon by the examiner was picked by the PTO or provided to the PTO by ITC. The Court overruled this objection. [Tr. 4407–08]. ITC now raises a different argument in its brief, that Motorola's counsel mischaracterized the basis by which ITC distinguished this prior art from the claims-in-suit during the prosecution of the patents-in-suit.

which was received on March 27, 1995, during the second day of jury deliberations. ITC objects to the Court's response because the Court declined to further instruct the jury that "they are obligated to consider each claim individually on a claim-by-claim basis." [Tr. 4576]. There can be no doubt that ITC's request is a correct statement of the law. That is why it was included in the Court's instructions to the jury[26]: "When determining infringement, you should consider each patent separately from the other patents in suit, and each claim of each patent individually from the other claims of that patent." [Jury Instruction 3.1]. As counsel for ITC noted when discussing this jury note in chambers, a question such as this implicates many issues. [Tr. 4575]. Those issues were all covered in the jury instructions, and the Court was well within its discretion to decline to emphasize one instruction over another and instead provide a simple, direct, and correct answer to the jury's question.

2. *"Are we to assume that the patent examiner is an expert in the field & would know what to look for or is this for us to decide?"*

■■■ After consultation with counsel the Court provided the following answer in response to this question: "the role of a patent examiner is typically discharged by one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art." This answer tracks nearly word for word the Federal Circuit's statement that patent examiners are presumed to "have some expertise in interpreting the [prior art] and to be familiar from their work with the level of ordinary skill in the art." *Markman* 52 F.3d at 986 (quoting *American Hoist and Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed.Cir. 1984)). The Court finds no error in its response to the jury note.

### F. Conclusion—Motion for a New Trial

Having considered each of ITC's alleged grounds for a new trial, both individually and in conjunction with each other, the Court concludes that a new trial in this matter is not warranted. ITC's motion is denied.

### VI. MOTOROLA'S MOTION FOR ATTORNEY'S FEES

■■■ "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. A case is exceptional if "it would be grossly unfair for the prevailing party to bear the cost of litigation, or where the conduct of the losing party is marked by bad-faith or unfairness." *Interspiro USA, Inc. v. Figgie Intern., Inc.*, 815 F.Supp. 1488, 1521 (D.Del.1993), *aff'd*, 18 F.3d 927 (Fed.Cir.1994). Factors to consider in determining whether a case is exceptional include the closeness of the case and the conduct of the parties, including evidence of bad faith. *Id.*

■■■ Each party presented positions which were for the most part reasonable, and the jury weighed the evidence and decided in favor of Motorola. Having reviewed the evidence in this case on numerous occasions before, during, and after trial, the Court cannot characterize ITC's positions in this litigation as meritless or frivolous. Motorola's motion must rise or fall, therefore, on ITC's vexatious conduct.

Both parties have done an admirable job in the post-trial briefing of presenting each others transgressions. This summary was unnecessary because the Court witnessed all of it, and the Court sees no value in rehashing the deplorable conduct of both parties. The record amply reflects the Court's repeated conclusions that counsel's conduct in this litigation was the worst observed by this Court in more than 22 years on the bench. The record also reflects that both sides were at fault, and while the Court finds that ITC's conduct was indeed more egregious than Motorola's, the difference is not great enough to justify the windfall that would accrue to Motorola if the Court were to declare this case "exceptional." The message which the Court

---

**26.** A complete copy of the jury instructions was given to the jury to use during their deliberations.

means to send with this ruling is not that ITC's counsel did nothing wrong, but rather that when both sides behave as counsel did in this case, no one side should benefit. The Court denies Motorola's motion for attorneys' fees.

One issue does potentially remain relating to ITC's blatant misconduct regarding its trial exhibits. The Court made findings regarding ITC's misconduct during the course of the trial and further ruled that the Court would sanction ITC and order that they reimburse Motorola for the additional expense incurred in responding to this specific instance of misconduct. [Tr. 1403]. This imposition of sanctions was not based upon a § 285 finding of "exceptionality" but rather upon the inherent power of the Court to manage its trial proceedings and sanction specific misconduct. If Motorola wishes to pursue this limited issue it shall so notify the Court within fourteen days after the date of this Memorandum Opinion by filing an appropriate motion and supporting affidavits detailing time expended and hourly rates.

## VII. CONCLUSION

ITC's motions to amend the judgment and for a new trial are denied. Motorola's motion for attorneys' fees is denied. ITC's motion for judgment as a matter of law is denied with respect to the jury's infringement verdict. ITC's motion for judgment as a matter of law regarding the jury's invalidity verdict is granted with respect to claims 8, 9, and 11 of the '089 patent and is denied with respect to all other representative claims. Judgment will be entered accordingly.